UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:12-CR-359-1

**FILED**

OCT 3 0 2012

JULIE A. RICHARDS, CLERK
US DISTRICT COURT, EDNC
BY ___KM___ DEP CLK

UNITED STATES OF AMERICA )
)
v. ) CRIMINAL INFORMATION
) Fed. R. Crim. P. 7
JESSE RAY "TOMMY" FAULKNER )

## THE UNITED STATES ATTORNEY CHARGES:

### INTRODUCTORY STATEMENT

1. JESSE RAY "TOMMY" FAULKNER, defendant herein, along with warehousemen, crop insurance adjusters, crop insurance agents, and others, worked together to defraud crop insurance companies of funds by filing false loss claims, to defraud the United States of America through the filing of false insurance claims ultimately reimbursed by the United States Department of Agriculture, to make material false statements in connection with the Federal Crop Insurance program, and to launder the proceeds and profits of the underlying fraud.

2. In 1938, Congress passed the Federal Crop Insurance Act (hereinafter referred to as the "Act"), 7 U.S.C. § 1501 et seq., in order to promote the economic stability of agriculture in the United States through, in part, a system of crop insurance.

3. In furtherance of this purpose, Congress established the Federal Crop Insurance Corporation (hereinafter referred to as "FCIC"), 7 U.S.C. § 1503, which was authorized to insure crop losses due to drought, flood, or other natural disaster, as determined by the Secretary of

United States Department of Agriculture (hereinafter referred to as "USDA"), 7 U.S.C. § 1508. Tobacco, corn, soybeans, and wheat were among the crops for which insurance was authorized under the Act. 7 U.S.C. § 1518.

4.    The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with an insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. Farmers are producers. A crop insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such unavoidable events caused the harvest for the farm to be less than the amount specified in the insurance contract, or written policy agreement. The insurance contract or written policy agreement, and premiums of coverage, are based on four or more years of production records for a particular crop grown by a farmer on a specific farm designated by its unique Farm Serial Number ("FSN").

5.    By delegated authority, the Secretary of USDA issued regulations governing the federal crop insurance program. 7 C.F.R. § 400 et seq.

6.    Since 2004, farmers have been required to take out insurance policies prior to the growing season. Farmers generally do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his yield (i.e., the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his crop insurance policy, then the insurance premium is typically deducted from the amount paid out to farmer under the policy.

7.    Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold, and the cause of loss.

2

8.     As statutorily mandated, the Secretary of USDA established the Risk Management Agency ("hereinafter referred to as "RMA"), an agency of the USDA, to supervise the FCIC and to administer all programs authorized under the Act. 7 U.S.C. § 6933.

9.     By 1986, most crop insurance was sold through private insurance companies contracting with RMA. USDA reimbursed the private insurance companies for any claims paid in connection with crop losses covered by the federal crop insurance program.

10.     The private insurance companies contracting with RMA must execute a Standard Reinsurance Agreement. See 7 C.F.R. §400.677.

11.     The Standard Reinsurance Agreement requires that all insurance agents and agency employees are properly licensed by the State in which they are doing business.

12.     USDA maintains a database of all reported and insured flue-cured and burley tobacco growers nationwide.

FACTUAL BACKGROUND

13.     JESSE RAY "TOMMY" FAULKNER was a resident of Southern Pines, North Carolina.

14.     JESSE RAY "TOMMY" FAULKNER was an agent for Philip Morris USA Inc. and operated as an independent tobacco broker.

15.     JESSE RAY "TOMMY" FAULKNER operated independent tobacco receiving stations in Wilson under the names of Liberty Tobacco Warehouse, Inc. and Creekside Tobacco & Investments. He was also a consultant for Select Tobacco LLC.

16.     FAULKNER also owned a 50% interest in Wilson Tobacco Services, LLC.

17.     Wilson Tobacco Services, LLC, was a North Carolina limited liability company established in January 2001, with its principal offices located in Kernersville, North Carolina.

3

Wilson Tobacco Services, LLC was engaged in the business of operating tobacco receiving stations in Wilson, North Carolina, and Carrollton, Kentucky. In 2006, Wilson Tobacco Services, LLC converted to Wilson Tobacco Services, Inc.

18. Carrollton Tobacco Services was an assumed name of Wilson Tobacco Services, LLC and Wilson Tobacco Services, Inc. in the Commonwealth of Kentucky.

19. Creekside Tobacco & Investments, Inc. (hereinafter referred to as "Creekside Tobacco") was a North Carolina corporation, established in April 2007, with its principal offices located in Angier, North Carolina. Creekside Tobacco was engaged in the business of tobacco investments.

20. Liberty Tobacco Warehouse, Inc. (hereinafter referred to as "Liberty Warehouse") was a North Carolina corporation, established in July 1992, with principal offices located in Wilson, North Carolina. Liberty Warehouse was engaged in the business of buying and selling tobacco.

21. Select Tobacco, LLC was a North Carolina limited liability company, established in August 2009, with principal offices located in Angier, North Carolina. Select Tobacco, LLC was engaged in the business of buying and selling tobacco. Select Tobacco, LLC was converted to Select Tobacco of Harnett County, LLC in June 2010.

22. Brightleaf Tobacco Farms Inc. was a North Carolina corporation, established in April 2005, with principal offices located in Spring Hope, North Carolina. Brightleaf Tobacco Farms Inc. was engaged in the business of buying and selling tobacco.

23. Golden Rod Tobacco Farms Inc. was a North Carolina corporation, established in April 2005, with principal offices located in Zebulon and Spring Hope, North Carolina. Golden Rod Tobacco Farms Inc. was engaged in the business of buying and selling tobacco.

4

24.     Bunn Hollow Farms Inc. was a North Carolina corporation, established in April 2005, with principal offices located in Middlesex and Spring Hope, North Carolina. Bunn Hollow Farms Inc. was engaged in the business of buying and selling tobacco.

25.     Phillip Morris U.S.A, a New York corporation established in 1902, was a wholly-owned subsidiary of Altria Group, a Virginia corporation established in 2003. Phillip Morris manufactured and sold cigarettes world-wide.

26.     Universal Leaf North America U.S., Inc. was a subsidiary of Universal Leaf Tobacco Company, Inc., which is a subsidiary of Universal Corporation, a leaf tobacco merchant and processor founded in 1918, with headquarters in Richmond, Virginia. Universal Corporation was engaged primarily in the business of procuring, processing, packing, and supplying of flue-cured and burley tobacco to manufactures of tobacco products.

27.     Universal Leaf North America U.S., Inc., a North Carolina corporation, maintained business offices in Nashville, North Carolina

28.     LAS Express Inc. was a North Carolina corporation, established in June 1998, with principal offices located in Rocky Mount, North Carolina. LAS Express Inc. was engaged in the preparation and filing of Federal and State income take returns. LAS Express Inc. was also engaged in the business of cashing tax refund checks.

29.     All Seasons Tax Services, Inc. was a North Carolina corporation established in June 2004, with principal offices located in Goldsboro, North Carolina. All Seasons Tax Services Inc. was engaged in the preparation and filing of Federal and State income tax returns. All Seasons Tax Services Inc. also engaged in the business of cashing tax refund checks.

5

## THE CONSPIRACY

30. Beginning on or about January 27, 2005, and continuing up to and including October 23, 2009, within the Eastern District of North Carolina and elsewhere, JESSE RAY "TOMMY" FAULKNER, defendant herein, did combine, conspire, confederate and agree with each other and others known and unknown to the United States Attorney to commit offenses against the United States, to wit:

    a. to knowingly make false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, insurance agreement, application for insurance and a guarantee, and any change or extension of any of the same, by renewal, deferment of action and otherwise, in violation of Title 18, United States Code, Section 1014;

    b. in a matter within the jurisdiction of the Federal Crop Insurance Corporation, an agency within the United States Department of Agriculture, a department of the executive branch of the United States, in connection with the Federal Crop Insurance Program, to knowingly and willfully: (i) falsify, conceal, and cover up by any trick, scheme and devise, a material fact; and (ii) make materially false, fictitious, and fraudulent statements and presentations; and (iii) make and use any false writing and document knowing the same to contain materially false, fictitious, and fraudulent statements, in violation of Title 18, United States Code, Section 1001;

    c. having devised and intending to devise any scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme or artifice and attempting to do so, to place in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, and to knowingly cause to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, in violation of Title 18, United States Code, Section 1341; and

    d. having devised and intending to devise any scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, or promises, and for the purpose of executing such scheme or artifice and attempting to do so, to transmit and cause to be transmitted by means of wire in interstate commerce, that is, by electronic mail and facsimile, writings, signals and sounds, in violation of Title 18, United States Code, Section 1343.

6

## PURPOSE OF THE CONSPIRACY

31.     It was the purpose of the conspiracy to profit through the filing of false and fictitious insurance claims, the sale of "hidden" tobacco, and to hide the criminal proceeds through payments in nominee names.

## MANNER AND MEANS

32.     In furtherance of the conspiracy, JESSE RAY "TOMMY" FAULKNER, defendant herein, along with others, employed the following manner and means:

a.     At the request of FAULKNER, co-conspiring farmers entered into contracts with Phillip Morris for the 2005, 2006, 2007, 2008, and 2009 crop years. The co-conspiring farmer falsely presented on the contracts that the tobacco sold would be from his/her farm. Some of the co-conspiring farmers had even ceased farming operations altogether.

b.     Other co-conspiring farmers obtained or caused to be obtained federal crop insurance policies for their tobacco crops.

c.     Other co-conspiring farmers then filed false crop insurance claims, and hid some or all of their tobacco production by selling it in nominee names or for cash to a co-conspiring tobacco warehouseman. The co-conspiring farmers profited under the scheme because they were paid twice for each pound of tobacco: once through the false crop insurance claim, and also through the sale of the "hidden" tobacco. Other co-conspirators profited through other aspects of the double sales scheme, including the original insurance commission, collecting a share of the hidden tobacco's second sale, and profit margins derived from subsequent sales to larger tobacco companies.

7

d.    FAULKNER would use the contracts fraudulently secured by the co-conspiring farmers to sell "hidden" tobacco.

e.    FAULKNER resold the "hidden" tobacco to Phillip Morris U.S.A.

f.    FAULKNER would either give the checks for the tobacco sold to co-conspiring farmer on the contract, who, in turn, would deposit the checks and then write checks payable to Creekside Tobacco; or deposit the checks into the accounts controlled by him, not the farmers.

g.    The co-conspiring farmers, who sold the hidden tobacco through FAULKNER, misrepresented the truth of farm operations in a variety of documents that were submitted to the private insurance entities.    For example, documents, including applications, reports of actual production history, acreage reports, and claim forms made and submitted in support of crop insurance coverage and claims, failed to truthfully show who had an insurable interest and who really suffered a loss and the extent of that loss.

h.    With both the multi-peril crop insurance claims and the crop-hail claims, a co-conspirator would either mail or caused to be mailed, through the U.S. mail, the claim forms, or would submit the claim forms by electronic mail.

i.    During the course of the conspiracy, FAULKNER sold or caused to be sold $5,181,816.90 worth of "hidden" flue-cured tobacco in North Carolina.

j.    During the course of the conspiracy, FAULKNER traveled from North Carolina to Kentucky, and sold and caused to be sold $8,097,429.13 worth of "hidden" burley tobacco in Kentucky.

Case 5:12-cr-00359-D   Document 10   Filed 10/30/12   Page 8 of 24

## OVERT ACTS

33. In furtherance of the conspiracy, and to effect the object thereof, there were committed by at least one of the co-conspirators in the Eastern District of North Carolina at least one of the following overt acts, among others:

### CO-CONSPIRING FARMER LANCY RAY JOYNER, JR.

a. On January 5, 2005, Lancy Ray Joyner, Jr. (hereinafter referred to as "Joyner") executed a written contract to sell tobacco to Phillip Morris U.S.A.

b. In early Spring 2005, the exact date being unknown, Joyner agreed to allow FAULKER to sell tobacco on Joyner's contract with Phillip Morris U.S.A. Joyner had ceased farming prior to the agreement.

c. On October 13, 2005, FAULKNER executed an amendment to Joyner's 2005 contract with Phillip Morris U.S.A. for the additional sale of 12,000 pounds of tobacco, increasing the overall contract to 132,000 pounds of tobacco.

d. On October 17, 2005, a co-conspirator executed another amendment to Joyner's 2005 contract with Phillip Morris U.S.A. for the additional sale of 24,000 pounds of tobacco, increasing the overall contract to 156,000 pounds of tobacco.

e. On the following dates and in the following manner, the co-conspiring tobacco warehouseman sold 155,814 pounds of tobacco on Joyner's contract with Phillip Morris U.S.A., for a total gross sale of $224,617.09, and deposited and/or cashed the payments:

9

| DATE OF SALE | POUNDS OF TOBACCO SOLD | PAYMENTS BY PHILLIP MORRIS CHECK NOS. | BANK WHERE CO-CONSPIRATOR DEPOSITED/ CASHED CHECKS |
|---|---|---|---|
| 08/15/2005 | 13,972 | 16043537 | Heritage Bank |
| | | 16043577 | First Citizens Bank |
| 08/23/2005 | 5,169 | 16043924 | First Bank |
| 08/29/2005 | 12,078 | 16044115 | Heritage Bank |
| 09/07/2005 | 19,269 | 16044277 | Heritage Bank |
| | | 16044324 | First Bank |
| 09/08/2005 | 5,666 | 16044390 | First Bank |
| | | 16044407 | First Bank |
| 09/09/2005 | 9,144 | 1604437 | First Bank |
| 09/14/2005 | 2,123 | 16044678 | First Bank |
| 09/15/2005 | 16,709 | 16044751 | First Bank |
| | | 16044771 | First Bank |
| 09/19/2005 | 18,868 | 16044782 | First Bank |
| 09/20/2005 | 3,623 | 16044885 | Cornerstone Bank |
| 09/21/2005 | 2,994 | 16044964 | First Bank |
| 10/06/2005 | 2,276 | 16045611 | Cornerstone Bank |
| 10/10/2005 | 7,649 | 16045632 | First Bank |
| 10/13/2005 | 11,918 | 16045871 | Cornerstone Bank |
| | | 16045892 | Cornerstone Bank |
| | | 16045922 | Cornerstone Bank |

10

| 10/24/2005 | 535 | 16045936 | Cornerstone Bank |
| 10/25/2005 | 19,814 | 16046054 | Heritage Bank |
| | | 16046078 | Heritage Bank |
| 10/26/2005 | 4,007 | 16046105 | Cornerstone Bank |

f. A co-conspirator endorsed the checks issued by Phillip Morris U.S.A. in connection with the tobacco sales above. The majority of the checks were endorsed in the name of "Lancy R. Joyner, Jr." and Liberty Tobacco Warehouse and/or another person.

g. On the following dates, Liberty Tobacco Warehouse, Inc. and/or a co-conspirator caused to be issued checks payable to "Lancy Joyner" as payment for the use of Joyner's 2005 tobacco contract, for a total payment of $37,500.00:

| DATE OF CHECK | CHECK NO. | AMOUNT |
| --- | --- | --- |
| 06/17/2005 | 3499 | $6,000.00 |
| 08/30/2005 | 1539 | $2,500.00 |
| 09/08/2005 | 3579 | $4,500.00 |
| 09/10/2005 | 3587 | $4,500.00 |
| 09/20/2005 | 3598 | $7,000.00 |
| 09/29/2005 | 3606 | $5,000.00 |
| 10/06/2005 | 3622 | $5,000.00 |
| 10/26/2005 | 1565 | $3,000.00 |

h.  On or about July 10, 2006, a contract was executed between Lancy Ray Joyner, Jr. and Phillip Morris U.S.A. for the sale of up to 157,000 pounds of tobacco.

i.  On September 27, 2006, FAULKNER executed an amendment to Joyner's 2006 contract with Phillip Morris U.S.A. for the additional sale of 35,000 pounds of tobacco, increasing the overall contract to 192,000 pounds of tobacco.

j.  On October 20, 2006, FAULKNER executed another amendment to Joyner's 2006 contract with Phillip Morris U.S.A. for the additional sale of 75,000 pounds of tobacco, increasing the overall contract to 267,000 pounds of tobacco.

k.  On the following dates, FAULKNER sold 266,935 pounds of tobacco on Joyner's 2006 contract with Phillip Morris USA, for a total gross sale of $402,823.40:

| DATE OF SALE | POUNDS OF TOBACCO SOLD |
|---|---|
| 08/10/2006 | 6,508 |
| 08/11/2006 | 10,250 |
| 08/14/2006 | 11,151 |
| 08/17/2006 | 1,618 |
| 08/21/2006 | 16,608 |
| 08/23/2006 | 2,908 |
| 08/24/2006 | 3,050 |
| 08/28/2006 | 19,167 |
| 08/29/2006 | 7,493 |
| 08/30/2006 | 10,469 |

| | |
|---|---|
| 09/06/2006 | 4,333 |
| 09/07/2006 | 2,399 |
| 09/08/2006 | 10,787 |
| 09/14/2006 | 811 |
| 09/18/2006 | 28,210 |
| 09/25/2006 | 16,761 |
| 09/28/2006 | 8,500 |
| 10/03/2006 | 14,528 |
| 10/04/2006 | 15,693 |
| 10/24/2006 | 75,691 |

l.  Joyner endorsed three of the checks issued by Phillip Morris U.S.A. in connection with the tobacco sales above.

m. FAULKNER endorsed the other checks issued by Phillip Morris U.S.A. in connection with the tobacco sales above. The majority of the checks were endorsed in the name of "Lancy R. Joyner, Jr." and Liberty Tobacco Warehouse and/or another person.

n. On the following dates, Liberty Tobacco Warehouse, Inc. and/or a co-conspirator caused to issued checks payable to "Lancy Joyner" as payment for the use of Joyner's 2006 tobacco contract, for a total payment of $26,386.34:

| DATE OF CHECK | CHECK NO. | AMOUNT |
|---|---|---|
| 08/07/2006 | 1742 | $1,000.00 |
| 08/11/2006 | 16046286 | $7,583.12 |
| 09/06/2006 | 1799 | $2,000.00 |
| 09/14/2006 | 16047611 | $1,295.17 |
| 10/12/2006 | 1828 | $6,500.00 |
| 11/21/2006 | unknown | $8,008.05 |

o. On or about February 1, 2007, Joyner entered into a contract with Phillip Morris U.S.A. for the sale of up to 200,000 pounds of tobacco. FAULKNER executed and caused to be executed the contract with Joyner's knowledge.

p. On May 15, 2007, Joyner executed a correction to his 2007 contract, revising the number of pounds to a total of 20,000 pounds of tobacco.

q. On October 9, 2007, Joyner executed an amendment to his 2007 contract with Phillip Morris U.S.A. for the additional sale of 180,000 pounds of tobacco, increasing the overall contract to 200,000 pounds of tobacco.

r. On October 15, 2007, Joyner executed another amendment to his 2007 contract with Phillip Morris U.S.A. for the additional sale of 100,000 pounds of tobacco, increasing the overall contract to 300,000 pounds of tobacco.

s. On October 22, 2007, Joyner executed another amendment to his 2007 contract with Phillip Morris U.S.A. for the additional sale of 100,000 pounds of tobacco, increasing the overall contract to 400,000 pounds of tobacco.

t. On the following dates, FAULKNER sold 400,000 pounds of tobacco on Joyner's 2007 contract with Phillip Morris USA, for a total gross sale of $629,068.49:

| DATE OF SALE | POUNDS OF TOBACCO SOLD |
|---|---|
| 10/09/2007 | 34,445 |
| 10/10/2007 | 61,014 |
| 10/11/2007 | 54,313 |
| 10/12/2007 | 36,630 |
| 10/15/2007 | 11,132 |
| 10/16/2007 | 57,172 |
| 10/17/2007 | 11,487 |
| 10/22/2007 | 81,148 |
| 10/23/2007 | 52,659 |

u. Lancy Ray Joyner, Jr. endorsed the checks issued by Phillip Morris USA in connection with the tobacco sales above and deposited them into his bank account.

v. On the following dates and in the following amounts, Joyner caused to be issued official bank checks payable to "Creekside Tobacco":

| DATE OF CHECK | AMOUNT OF CHECK |
|---|---|
| 10/10/2007 | $58,758.58 |
| 10/11/2007 | $44,715.75 |
| 10/12/2007 | $83,783.47 |
| 10/15/2007 | $95,043.63 |

15

| 10/16/2007 | $18,315.66 |
|------------|-----------|
| 10/17/2007 | $59,467.04 |
| 10/18/2007 | $18,066.64 |
| 10/22/2007 | $29,932.54 |

w. On the following dates and in the following amounts, Joyner wrote checks payable to "Creekside Tobacco" and drawn on his farm account at RBC Centura Bank in Nashville, North Carolina:

| DATE OF CHECK | AMOUNT OF CHECK |
|---------------|-----------------|
| 10/22/2007 | $46,000.00 |
| 10/23/2007 | $68,000.00 |
| 10/23/2007 | $21,900.00 |
| 10/29/2007 | $68,000.00 |

x. On September 20, 2007, Creekside Tobacco & Investments, Inc. issued a check payable to "Lancy Joyner, Jr. " in the amount of $9,000.00. The payment was made for the use of Joyner's tobacco contract.

y. On October 3, 2007, Creekside Tobacco & Investments, Inc. issued a check payable to "Lancy Joyner, Jr." in the amount of $9,000.00. The payment was made for the use of Joyner's tobacco contract.

USE OF OTHER CONTRACTS

z. On the following dates, and unbeknownst to "S.J.," JESSE RAY "TOMMY" FAULKNER used the tobacco contract between "S.J." and Phillip Morris to sell hidden tobacco:

| DATE | AMOUNT OF SALE |
|------|----------------|
| 09/28/2006 | $16,830.16 |
| 10/02/2006 | $14,548.27 |
| 10/02/2006 | $11,071.38 |
| 10/05/2006 | $10,166.35 |
| 10/10/2006 | $20,930.24 |
| 10/25/2006 | $23,735.03 |

aa. FAULKNER endorsed and cashed the checks listed above through a co-conspirator check casher.

bb. On the following dates, and unbeknownst to Bright Leaf Tobacco Farms Inc., FAULKNER used the tobacco contract between Bright Leaf Tobacco Farms Inc. and Phillip Morris to sell hidden tobacco:

| DATE | AMOUNT OF SALE |
|------|----------------|
| 09/07/2006 | $16,935.15 |
| 09/07/2006 | $4,421.47 |
| 09/20/2006 | $25,196.96 |
| 09/21/2006 | $13,974.84 |
| 09/25/2006 | $54,289.39 |

17

| 10/11/2006 | $10,775.29 |
| 10/12/2006 | $47,183.79 |
| 10/24/2006 | $7,255.16 |
| 10/25/2006 | $8,655.40 |

cc. FAULKNER endorsed and cashed the checks listed above through a co-conspirator check casher.

dd. On the following dates, and unbeknownst to Golden Rod Tobacco Farms Inc., FAULKNER used the tobacco contract between Golden Rod Tobacco Farms Inc. and Phillip Morris to sell hidden tobacco:

| DATE | AMOUNT OF SALE |
|------|----------------|
| 09/07/2006 | $10,739.97 |
| 09/13/2006 | $7,140.61 |
| 09/27/2006 | $5,896.65 |
| 10/02/2006 | $7,372.10 |
| 10/05/2006 | $14,598.99 |
| 10/12/2006 | $1,276.15 |
| 10/12/2006 | $10,488.13 |

ee. FAULKNER endorsed and cashed the checks listed above through a co-conspirator check casher.

18

ff. On the following dates, and unbeknownst to Bunn Hollow Farms Inc., FAULKNER used the tobacco contract between Bunn Hollow Farms Inc. and Phillip Morris to sell hidden tobacco:

| DATE | AMOUNT OF SALE |
| --- | --- |
| 09/08/2006 | $22,969.36 |
| 09/18/2006 | $11,395.25 |
| 09/18/2006 | $11,443.29 |
| 09/25/2006 | $7,614.66 |
| 09/28/2006 | $12,579.54 |
| 10/10/2006 | $2,365.36 |
| 10/12/2006 | $17,220.21 |

gg. JESSE RAY "TOMMY" FAULKNER endorsed and cashed the checks listed above through a co-conspirator check casher.

hh. On the following dates, and unbeknownst to "R.J."., JESSE RAY "TOMMY" FAULKNER used the tobacco contract between "R.J." and Phillip Morris to sell hidden tobacco:

| DATE | AMOUNT OF SALE |
| --- | --- |
| 08/11/2006 | $6,121.71 |
| 08/11/2006 | $7,258.59 |
| 08/17/2006 | $2,816.75 |
| 08/29/2006 | $1,720.09 |
| 09/07/2006 | $9,902.47 |

19

| 09/13/2006 | $13,669.63 |
|------------|-------------|
| 09/18/2006 | $8,427.78 |
| 09/27/2006 | $20,046.91 |
| 10/05/2006 | $24,592.22 |

ii. FAULKNER endorsed and cashed the checks listed above through a co-conspirator check casher.

jj. unbeknownst to his employee "J.D.", JESSE RAY "TOMMY" FAULKNER and another co-conspirator created a fictitious company named for the purpose of selling hidden tobacco through Universal Leaf North America, and did so on the following dates:

| DATE | AMOUNT OF SALE |
|------------|-----------------|
| 09/19/2006 | $61,000.78 |
| 09/27/2006 | $66,545.83 |
| 10/03/2006 | $60,860.90 |
| 10/03/2006 | $66,764.45 |
| 10/10/2006 | $68,122.31 |
| 10/10/2006 | $63,828.35 |
| 10/17/2006 | $54,410.43 |
| 10/17/2006 | $53,586.66 |

Case 5:12-cr-00359-D   Document 10   Filed 10/30/12   Page 20 of 24

kk. FAULKNER endorsed and cashed the checks listed above through a co-conspirator check casher.

ll. Between January 27, 2005, and March 28, 2006, FAULKNER cashed 176 checks totaling $1,044,943.14, through LAS Express Inc.. The checks were in various payee names and represented the proceeds from the sales of hidden tobacco on various contracts.

mm. Between November 2, 2006, and December 29, 2006, FAULKNER cashed 119 checks totaling $2,331,111.72, through All Seasons Tax Services Inc.. The checks were in various payee names and represented the proceeds from the sales of hidden tobacco on various contracts.

KENTUCKY BURLEY TOBACCO SCHEME

nn. Between November 2006 and March 2007, JESSE RAY "TOMMY" FAULKNER sold $8,097,429.13 worth of "hidden" burley tobacco in Kentucky. The checks were in various payee names and represented the proceeds from the sale of hidden tobacco on various burley tobacco contracts.

oo. FAULKNER cashed and caused to be cashed some of the checks in the Eastern District of North Carolina, including the following:

| Date Cashed | Check Number | State of Payee | Amount |
|---|---|---|---|
| 01/30/2006 | 23020196 | MO | $2,292.86 |
| 01/30/2006 | 23020126 | MO | $1,706.85 |
| 01/30/2006 | 23020160 | KS | $1,191.84 |
| 02/02/2006 | 29382 | KY | $2,500.00 |
| 02/02/2006 | 29388 | KY | $2,500.00 |
| 11/13/2006 | 23021023 | KY | $22,677.15 |
| 11/13/2006 | 23021059 | KY | $34,906.19 |
| 11/13/2006 | 23021061 | KY | $32,737.31 |

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### *(Conspiracy to Commit Money Laundering*
### *18 U.S.C. § 1956(h))*

1.      Paragraphs One through Twenty-Nine and Thirty-Two of Count One above are hereby re-alleged and incorporated by reference.

2.      Beginning on or about January 27, 2005, the exact date being unknown, and continuing up to and including October 23, 2009, within the Eastern District of North Carolina, defendant herein, JESSE RAY "TOMMY" FAULKNER, did combine, conspire, confederate and agree with others known and unknown to the United States Attorney to commit the following offenses against the United States:

a.      to knowingly conduct a financial transaction affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, specifically, violations of 18 U.S.C. § 1014, 18 U.S.C. § 1341, and 18 U.S.C. § 1343, with the intent to promote the carrying on of specified unlawful activity and knowing the financial transaction involved the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and

b.      to knowingly engage in a monetary transaction within the United States in criminally derived property with a value greater than $10,000, which was in fact derived from a specified unlawful activity, specifically, violations of 18 U.S.C. § 1014, 18 U.S.C. § 1341, and 18 U.S.C. § 1343, in and affecting interstate and foreign commerce, in violation of 18 U.S.C. § 1957.

All in violation of Title 18, United States Code, Section 1956(h).

Case 5:12-cr-00359-D   Document 10   Filed 10/30/12   Page 22 of 24

## FORFEITURE NOTICE

The defendant is given notice of the provisions of 18 U.S.C. Section 981(a)(1)(C), as made applicable by Title 28, United States Code, Section 2461, and 18 U.S.C. § 982 that all of their interest in all property specified herein is subject to forfeiture.

As a result of the foregoing offenses as alleged in this criminal information, the defendant shall forfeit to the United States any and all property constituting, or derived from, any proceeds the said defendant obtained directly or indirectly as a result of the said offenses and, in addition, shall forfeit to the United States any property involved in the offense stated in Counts One and Two of this criminal information.

The forfeitable property includes, but is not limited to:

(1) personal property;

(2) real property; and

(3) currency in the amount of $13,279,241.00, representing the gross proceeds of offenses stated in this criminal information.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to, or deposited with, a third person;

(3)     has been placed beyond the jurisdiction of the court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be subdivided without difficulty,

23

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

All in accordance with 18 U.S.C. §§ 981 and 982.

THOMAS G. WALKER
United States Attorney

BY: BANUMATHI RANGARAJAN
Assistant United States Attorney
Criminal Division